```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
BAYERISCHE LANDESBANK,                                  :
                                                        :
                 Plaintiff/Counter-Defendant,           :
                                                        :
        v.                                              :    15 Civ. 7287 (KPF)
                                                        :
NEBRASKA INVESTMENT FINANCE                             :    OPINION AND ORDER
AUTHORITY,                                              :
                                                        :
                 Defendant/Counter-Claimant.            :
                                                        :
------------------------------------------------------- X
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 27, 2017
```

KATHERINE POLK FAILLA, District Judge:

Pending before the Court are two cross-motions for summary judgment. Defendant/Counter-Claimant Nebraska Investment Finance Authority ("NIFA") seeks summary judgment on its three breach-of-contract counterclaims, and dismissal of Plaintiff/Counter-Defendant Bayerische Landesbank's ("BayernLB") breach-of-contract, unjust-enrichment, and fraud claims.[1] BayernLB seeks the converse: summary judgment on its three claims and dismissal of NIFA's three counterclaims.

The parties' arguments, while diametric, suffer from the same two problems. The first is that the three investment agreements at the heart of this case (the "Investment Agreements") are ambiguous. The second is that the extrinsic evidence the parties have introduced does not resolve the Investment

---

[1] NIFA purports to be seeking "partial" summary judgment. (Dkt. #36). But NIFA asks this Court to enter summary judgment on all three of its counterclaims and all three of BayernLB's claims. In substance, then, NIFA is seeking a full summary judgment that would terminate this case in its entirety.

Agreements' ambiguities. Those problems do not prevent the Court from dismissing BayernLB's unjust-enrichment claim (as BayernLB concedes the Court should) or its fraud claim (which is merely duplicative of its underlying contract claim). But they do preclude the Court from entering summary judgment on any of the contract claims or counterclaims in this case.

Accordingly, and for the reasons set forth below, BayernLB's motion for summary judgment is denied, and NIFA's motion for summary judgment is granted in part and denied in part.

## BACKGROUND[2]

### A. Factual Background

The parties agree on most of the facts. They also agree that, at root, this case is a dispute over the three Float Accounts created by the three Investment Agreements. (BayernLB 56.1 Response ¶ 2).

NIFA is "an independent instrumentality" organized under Nebraska law. (BayernLB 56.1 Response ¶ 9). One of NIFA's functions is to provide mortgages

---

[2] This Opinion draws on evidence from the Declaration of Timothy R. Kenny ("Kenny Decl." (Dkt. #41)) and the exhibits attached thereto ("Kenny Decl., Ex. [ ]"); the Declaration of John A. Gausepohl ("Gausepohl Decl." (Dkt. #44)) and the exhibits attached thereto ("Gausepohl Decl., Ex. [ ]"); and the Declaration of Hilary E. Deutch ("Deutch Decl." (Dkt. #45)) and the exhibits attached thereto ("Deutch Decl., Ex. [ ]"). The Opinion also cites to the parties' responsive Local Civil Rule 56.1 statements of material fact ("BayernLB 56.1 Response" (Dkt #48); "NIFA 56.1 Response (Dkt. #50)), which provide the parties' respective factual assertions and indicate where the parties dispute facts. Finally, the Court will cite to the deposition transcripts that BayernLB provided in a CD ("[Witness Name] Tr."). For ease of reference, the Court refers to the parties' opening briefs as "NIFA Br." (Dkt. #38) and "BayernLB Br." (Dkt. #46), and to their opposition briefs as "NIFA Opp." (Dkt. #47) and "BayernLB Opp." (Dkt. #54).

The case was transferred to this Court after the instant motions were scheduled, and this Opinion is effectively the Court's introduction to the parties. The Court begins by observing that the briefing on both sides was excellent, for which the Court is grateful. For future cases before this Court, however, the parties are cautioned to observe both the letter and the spirit of the relevant page limitations.

to Nebraskans, a function NIFA facilitates by issuing bonds. (*Id.* at ¶¶ 9-10). NIFA uses the proceeds of these bonds to purchase mortgage-backed securities and mortgage loans. (*Id.* at ¶ 12). Depending on the term of the underlying mortgages, some of NIFA's investments can generate revenue for over 30 years. (*Id.* at ¶ 13).

On July 1, 1994, NIFA and its then-Trustee, Norwest Bank Minnesota, N.A. (the "Trustee"), entered into a General Indenture of Trust (the "General Indenture"). (NIFA 56.1 Response ¶ 3).[3] In 1998, NIFA and the Trustee entered into three Supplemental Indentures of Trust (the "Supplemental Indentures") — one for each of the three bond series at issue in this litigation: (i) the January 1, 1998 Supplemental Indenture, entered into in connection with NIFA's Single Family Housing Revenue Bonds 1998 Series A/B (the "A/B Series"); (ii) the June 1, 1998 Supplemental Indenture, which corresponds to NIFA's 1998 Series C/D/E/F (the "C/D/E/F Series"); and (iii) the October 1, 1998 Supplemental Indenture, which relates to NIFA's 1998 Series G/H bonds (the "G/H Series"). (*Id.* at ¶¶ 3-4; Kenny Decl., Ex. C, E, G).

The General Indenture and Supplemental Indentures authorize the Trustee to invest the proceeds of NIFA's mortgages and mortgage-backed securities. (BayernLB 56.1 Response ¶ 22; NIFA 56.1 Response ¶ 7). To this end, in 1998, the Trustee and BayernLB entered into three Investment Agreements that correlate with the three aforementioned bond series: (i) the

---

[3] After the General Indenture was executed, Wells Fargo Bank, N.A. ("Wells Fargo") and Norwest Bank Minnesota, N.A. merged. (BayernLB 56.1 Response ¶ 15). Since then, Wells Fargo has served as the Trustee. (*Id.*).

January 8, 1998 Investment Agreement, entered into in connection with NIFA's A/B Series; (ii) the June 4, 1998 Investment Agreement, which corresponds to the C/D/E/F Series; and (iii) the October 23, 1998 Investment Agreement, which relates to NIFA's G/H Series. (NIFA 56.1 Response ¶ 18; Gausepohl Decl., Ex. B, D, F). This case is about one class of accounts that these three Investment Agreements created: the Float Accounts. (BayernLB 56.1 Response ¶ 2).

Three provisions of the Investment Agreements merit close attention here. The first describes the types of funds that the Trustee could deposit into the Float Accounts. The Investment Agreements — the language in all three is virtually identical — provide that "[t]he Trustee shall … deposit amounts held in the Float Fund (described in Schedule I to Exhibit A) to the Float Account (described in Schedule I to Exhibit A)." (Gausepohl Decl., Ex. B, § 1.1(b); *id.* at Ex. D, § 1.1(c); *id.* at Ex. F, § 1.01(b)). And Schedule I to the Investment Agreements defines "Float Fund" as follows: "Collectively, the 1998 Series [A/B/C/D/E/F/G/H] Capitalized Interest Account, deposits to the Debt Service Fund, Revenue Fund and Redemption Fund established under the Indenture related to the 1998 Series [A/B/C/D/E/F/G/H] Bonds." (*Id.* at Ex. B, A-3; *accord id.* at Ex. D, A-3; *id.* at Ex. F, A-3).

The second important provision in the Investment Agreements provides a termination date for the Float Accounts. Per the Investment Agreements, the Float Accounts would terminate after one of the following triggering events:

> The first to occur of [i] a withdrawal of all Invested Moneys on deposit in this Account and either the date

>   the Depository has received written notice from the Trustee in the form of Exhibit C that no additional deposits will be made to this Account or the date on which the Trustee may no longer make any additional deposits to this Account or [ii] September [1 or 4], 2029.

(Gausepohl Decl., Ex. B, § 2 and A-3; *id.* at Ex. D, § 2 and A-4; *id.* at Ex. F, art. 2 and A-3 to A-4).

Finally, all three Investment Agreements obligate the Trustee to notify BayernLB if the bonds underlying the Investment Agreements are refunded. Per Section 7.13 of the Investment Agreements: "The Trustee shall promptly notify the Depository in writing as soon as any action is taken to effect a partial or complete refunding of the Bonds." (Gausepohl Decl., Ex. B, § 7.13; *id.* at Ex. D, § 7.13; *id.* at Ex. F, § 7.13).

NIFA redeemed the A/B Series, C/D/E/F Series, and G/H Series bonds in 2010. (NIFA 56.1 Response ¶ 32). However, the Trustee kept depositing money into the Float Accounts after NIFA redeemed these bonds. (*Id.* at ¶ 35).

The relationship between NIFA and BayernLB was copacetic until August 2015, when BayernLB informed NIFA that it intended to terminate the Investment Agreements and return the funds NIFA had invested with BayernLB. (BayernLB 56.1 Response ¶¶ 51-53). BayernLB followed through with that plan on August 21, 2015, and this suit followed. (BayernLB 56.1 Response ¶ 54; NIFA 56.1 Response ¶ 39).

## B.  Procedural Background

On August 22, 2015, NIFA sued BayernLB in the United States District Court for the District of Nebraska.  (NIFA 56.1 Response ¶ 41; Deutch Decl., Ex. U).  NIFA voluntarily dismissed that suit on October 28, 2015.  (NIFA 56.1 Response ¶ 44; Deutch Decl., Ex. U).

The instant case began on September 15, 2015, when BayernLB filed its Complaint against NIFA.  (Dkt. #1).[4]  In broad strokes, the Complaint alleges that NIFA breached all three Investment Agreements by depositing money into the Float Accounts after redeeming the underlying bonds.  The Complaint brings three Counts:  (i) unjust enrichment, (ii) fraud, and (iii) breach of contract.  (*Id.* at ¶¶ 32-47).

On October 28, 2015, NIFA filed its Answer and Counterclaims.  (Dkt. #17).  NIFA contends that it did not breach the Investment Agreements.  (*See id.* at ¶¶ 59, 80).  Rather — perhaps theorizing that its best defense is a good offense — it insists that *BayernLB* breached the Investment Agreements by prematurely terminating them.  (*Id.* at ¶¶ 82-96).  To this end, NIFA brings three counterclaims, all for breach of contract (i.e., one counterclaim for each of the three Investment Agreements).  (*Id.*).

The parties filed cross-motions for summary judgment on April 15, 2016.  (Dkt. # 36, 42).  Briefing concluded when the parties filed opposition papers on May 6, 2016.  (Dkt. #47-54).

---

[4]    This case was initially assigned to the Honorable Shira A. Scheindlin.  Following Judge Scheindlin's retirement from the bench, the case was reassigned to the undersigned.  (*See* Dkt. Entry on April 12, 2016).

# DISCUSSION

### A. Applicable Law

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where 'parties file[ ] cross-motions for summary judgment[,] ... each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (quoting *Morales* v. *Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001)).

"Under New York law," which both parties agree governs here (*see* BayernLB 56.1 Response ¶ 36), "contractual interpretation on a summary judgment motion takes place in two stages." *Great Minds* v. *John Wiley & Sons, Inc.*, — F. Supp. 3d —, No. 15 Civ. 4884 (RJS), 2016 WL 4626565, at *3 (S.D.N.Y. Sept. 2, 2016). "First, a court must determine, as a matter of law, whether the disputed contractual terms are ambiguous." *Id.* Making this determination requires a court to construe contract terms "in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *Luitpold Pharm., Inc.* v. *Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (quoting *MHR Capital Partners LP* v. *Presstek, Inc.,* 12 N.E.2d 640, 645 (2009)). "An agreement is unambiguous if the language it uses has a definite and precise meaning,

7

unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion[.]" *Ellington* v. *EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (internal quotation marks and citation omitted). In contrast, an agreement is ambiguous if, "read as a whole, [it] fails to disclose its purpose and the parties' intent … or when specific language is susceptible of two reasonable interpretations[.]" *Id.* (internal quotation marks and citations omitted).

"[I]f a court finds that the contractual language is ambiguous, then it should typically deny summary judgment." *Great Minds*, 2016 WL 4626565, at *3. But "a court may proceed to the second stage" of interpreting a contract on summary judgment "and 'resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide [to] the contrary,' or if the nonmoving party 'fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.'" *Id.* (quoting *Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)); *see also Greenfield* v. *Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous[.]"). Put another way: Extrinsic evidence will not create a genuine issue of material fact if it supports only one interpretation of the contract at issue. *Luitpold Pharm.*, 784 F.3d at 88.

8

**B.     Analysis**

This case boils down to a dispute over two questions.  First, did the Investment Agreements allow NIFA to continue making deposits into the Float Accounts after NIFA redeemed the underlying bonds?  NIFA says yes; BayernLB says no.  The Investment Agreements support both parties' interpretations.  And both parties have introduced extrinsic evidence that substantiates their respective takes on this question.  In consequence, the Court cannot enter summary judgment on BayernLB's claim that NIFA breached the Investment Agreements.

The second question is derivative of the first:  Did BayernLB breach the Investment Agreements by terminating them on August 21, 2015?  Here, too, both parties supply different answers.  And here, too, the plain language of the Investment Agreements and the parties' extrinsic evidence raise genuine disputes of material fact.  Those fact disputes preclude the Court from entering summary judgment on any of BayernLB's three breach-of-contract counterclaims.

The only remaining causes of action are BayernLB's claims for unjust enrichment and fraud.  Both fail as matters of law.  The Investment Agreements preclude BayernLB from recovering under the quasi-contractual theory of unjust enrichment.  And BayernLB cannot maintain its fraud cause of action because it is duplicative of BayernLB's contract claim.

The rest of this Opinion proceeds in two steps.  The Court will begin by considering BayernLB's breach-of-contract, unjust-enrichment, and fraud

claims. Then, the Court will address NIFA's three breach-of-contract counterclaims.

### 1. The Court Denies Summary Judgment as to BayernLB's Breach-of-Contract Claims, But Grants Summary Judgment Dismissing BayernLB's Unjust Enrichment and Fraud Claims

#### a. Breach of Contract

BayernLB argues that NIFA breached all three Investment Agreements by continuing to making deposits into the Float Accounts after redeeming the A/B Series, C/D/E/F Series, and G/H Series bonds. NIFA responds that the Investment Agreements did not prohibit post-redemption deposits into the Float Accounts. The Investment Agreements' text and the parties' extrinsic evidence establish that both interpretations are reasonable. And for that reason, the Court cannot enter summary judgment on BayernLB's breach-of-contract claim.

The Court begins with the Investment Agreements' text. The Investment Agreements obligate the Trustee to deposit money "held in the Float Fund ... to the Float Account." (Gausepohl Decl., Ex. B, § 1.1(b); *id.* at Ex. D, § 1.1(c); *id.* at Ex. F, § 1.01(b)). Schedule I to Exhibit A of all three Investment Agreements provides the following definition of "Float Fund": "Collectively, the 1998 Series [A/B/C/D/E/F/G/H] Capitalized Interest Account, deposits to the Debt Service Fund, Revenue Fund and Redemption Fund established under the Indenture related to the 1998 Series [A/B/C/D/E/F/G/H] Bonds." (*Id.* at Ex. B at A-3; *accord id.* at Ex. D at A-3; *id.* at Ex. F at A-3).

The crux of BayernLB's textual analysis is the final clause of this text — "*related to* the 1998 Series [A/B/C/D/E/F/G/H] Bonds." BayernLB insists that "[w]hen a Bond series is called or redeemed, … there can no longer be any funds 'related to' that series." (BayernLB Br. 10). Thus, BayernLB argues, when NIFA redeemed all of the bonds at issue in this litigation, there were no longer funds "related to" those bonds, and therefore NIFA could not make deposits into the Float Accounts.

NIFA advances a broader definition of the permissible sources of deposits into the Float Accounts. The Investment Agreements' definition of "Float Fund" encompasses "deposits to the … Revenue Fund … established under the Indenture related to the 1998 Series [A/B/C/D/E/F/G/H] Bonds." The parties agree that "the General Indenture[ ] and Supplemental Indentures contemplate and authorize continued deposits into the Revenue Fund, even after bond redemption." (BayernLB 56.1 Response ¶ 44). Indeed, the General Indenture defines "Revenue Fund" to include "all Revenues derived from the [m]ortgage loans … and the [m]ortgage-[b]acked [s]ecurities" in which NIFA invested. (Kenny Decl., Ex. A, § 5.03). And those investments hold the potential to continue generating revenue for decades. (BayernLB 56.1 Response ¶ 13). Thus, NIFA insists, the Investment Agreements contemplate that NIFA will continue making deposits into the Float Accounts even after NIFA redeems the underlying bonds.

Both parties' interpretations of "Float Fund" are reasonable. BayernLB's belief that there could be no funds "related to" a bond series after the series is

11

redeemed is intuitively appealing. But NIFA's reliance on the Revenue Fund as a source of post-redemption deposits is also consistent with the Investment Agreements' text. Whether NIFA could continue depositing funds into the Float Accounts post-redemption is ambiguous.

Other parts of the Investment Agreements yield similar uncertainty. Section 7.13 of the Investment Agreements requires "[t]he Trustee … promptly [to] notify [BayernLB] in writing as soon as any action is taken to effect a partial or complete refunding of the Bonds." (Gausepohl Decl., Ex. B, § 7.13; *id.* at Ex. D, § 7.13; *id.* at Ex. F, § 7.13). BayernLB reads this notice provision to require the Trustee to inform BayernLB when NIFA has *redeemed* any of the bonds underlying the Investment Agreements. (BayernLB Br. 12-13). NIFA retorts that BayernLB over-reads Section 7.13: "A refunding," NIFA argues, is simply "one way bonds can be redeemed, but not the only way." (NIFA 56.1 Response ¶ 28). In any case, Section 7.13 does not resolve the broader question of whether NIFA could make post-redemption deposits into the Float Accounts

Nor does the parties' extrinsic evidence answer this question.[5] BayernLB has submitted several "internal NIFA emails" that, by BayernLB's reading,

---

5   Whether deemed intrinsic or extrinsic to the Investment Agreements, the parties' Term Sheets are similarly unavailing. BayernLB argues that the Term Sheets must be read in conjunction with the Investment Agreements, because together they "are a single integrated agreement." (BayernLB Br. 19). NIFA responds that the Investment Agreements are a final version of the Term Sheets, and thus supersede them. (NIFA Opp. 20-22). The Term Sheets strike the Court as most analogous to earlier drafts of the Investment Agreements, which renders the Term Sheets extrinsic evidence. *See Grant & Eisenhofer, P.A.* v. *Bernstein Liebhard, LLP*, No. 14 Civ. 9839 (JMF), 2016 WL 5416502, at *1 (S.D.N.Y. Sept. 28, 2016). But again, these distinctions are academic, because the Term Sheets contribute to, rather than resolve, the Investment Agreements'

establish "the extraordinary measures NIFA took to conceal from BayernLB … the fact that the NIFA bonds had been redeemed." (BayernLB Br. 5). But those emails are not as nefarious as BayernLB claims; none of them suggests that NIFA's employees believed that NIFA had breached the Investment Agreements. (*See* Deutch Decl., Ex. N, O, P). And the deposition testimony the parties have submitted cuts both ways: Individuals who worked for BayernLB when the Investment Agreements were consummated testified that they believed the Investment Agreements barred NIFA from depositing funds in the Float Accounts post-redemption. (*See* Gausepohl Tr. 46:13-18, 90:8-14; Gregory Tr. 45:6-10, 58:17-20). NIFA's Treasurer Judy Krasomil testified that she believed just the opposite. (*See* Krasomil Tr. 195:12-196:1).

In sum, neither the Investment Agreements nor the parties' extrinsic evidence establishes whether NIFA could deposit funds in the Float Accounts after redeeming the underlying bonds. And in turn, the Court cannot enter summary judgment for BayernLB on its breach-of-contract claim.

---

ambiguities. The Term Sheets preceding the A/B Series and C/D/E/F Series Investment Agreements contemplated that the Float Funds associated with those series would terminate on "September 4, 2029 *or upon earlier redemption* or maturity of the 1998 Series [A/B/C/D/E/F] Bonds." (Gausepohl Decl., Ex. A, C (emphasis added)). And both Term Sheets state that the Investment Agreements patterned after them "must conform to the term of the bid and the bidding specifications." (*Id.* at Ex. A, C). But the Term Sheets' "redemption" language did *not* make its way into the A/B Series or C/D/E/F Series Investment Agreements. The Term Sheets thus leave open the question whether the parties ultimately agreed that NIFA could deposit money into the Float Accounts after redeeming the bonds.

### b. Unjust Enrichment

BayernLB's unjust-enrichment claim presents a much simpler question. "[A] party may not recover in ... unjust enrichment where the parties have entered into a contract that governs the subject matter" of their dispute. *Cox* v. *NAP Const. Co.*, 10 N.Y.3d 592, 607 (2008). BayernLB concedes that "its claim of unjust enrichment does not lie" "because the parties have an enforceable contract that governs this dispute." (BayernLB Opp. 14 n.11). Accordingly, the Court grants NIFA's motion for summary judgement insofar as it seeks dismissal of BayernLB's unjust-enrichment claim.

### c. Fraud

Similarly straightforward is BayernLB's fraud claim. "Under New York law, claims of fraud ... that merely duplicate contract claims must be dismissed." *Bullmore* v. *Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 469 (S.D.N.Y. 2007); *see, e.g., Vill. Grp. 30, Inc.* v. *Kyusung Cho*, 83 A.D.3d 931, 932 (N.Y. App. Div. 2d Dep't 2011) ("[A] plaintiff cannot sustain a cause of action sounding in fraud, ... [where] the defendant's purported[ ] fraud[ ] ... was precisely the same act that formed the basis of the [plaintiff's] breach of contract cause of action."). NIFA contends that BayernLB's fraud claim suffers from this very defect. (NIFA Br. 21-22). BayernLB — perhaps sensing that this case is *really* a contract dispute — attempts to resist this conclusion in a footnote to its opposition brief: "BayernLB's claim for fraud is not appropriate on summary judgment." (BayernLB Opp. 14 n.11).

NIFA has the better argument.  BayernLB's fraud claim is a repackaged version of its breach-of-contract claim.  In its Complaint, BayernLB alleges that "NIFA knowingly, deliberately and with intent to defraud BayernLB, caused deposits to be made into the Float Accounts after the Redemption Dates," in alleged derogation of NIFA's obligations under "the Indenture and Investment Agreements." (Compl. ¶¶ 39-40).  Put another way, BayernLB alleges that NIFA committed fraud when it breached the Investment Agreements.  Because there is no daylight between BayernLB's fraud and contract claims, the Court grants NIFA's motion for summary judgment insofar as it seeks dismissal of BayernLB's fraud claim.

### 2. The Court Denies Summary Judgment on All Three of NIFA's Breach-of-Contract Counterclaims

NIFA argues that BayernLB breached the three Investment Agreements when it terminated them on August 21, 2015.  Whether BayernLB prematurely terminated the Investment Agreements, however, hinges on whether NIFA was permitted to make post-redemption deposits into the Float Accounts.  Accordingly, the Court cannot enter summary judgment on NIFA's breach-of-contract counterclaims.

All three Investment Agreements state that the Float Accounts will terminate on:

> The first to occur of [i] a withdrawal of all Invested Moneys on deposit in this Account and either the date the Depository has received written notice from the Trustee in the form of Exhibit C that no additional deposits will be made to this Account or the date on which the Trustee may no longer make any additional deposits to this Account or [ii] September [1 or 4], 2029.

(Gausepohl Decl., Ex. B, § 2 and A-3; *id.* at Ex. D, § 2 and A-4; *id.* at Ex. F, art. 2 and A-3 to A-4).

Condition (ii) has not obtained. But there is a genuine dispute of material fact over whether Condition (i) has. The above-quoted text provides that the Float Accounts terminate upon "a withdrawal of all Invested Moneys on deposit in [the Float] Account and … the date on which the Trustee may no longer make any additional deposits to th[e] [Float] Account." And whether NIFA (through the Trustee) was entitled to "make any additional deposits to th[e] [Float] Account[s]" after NIFA redeemed the underlying bonds is the unanswered question at the core of this lawsuit.[6] If NIFA *could* make post-redemption deposits, then it would appear that BayernLB prematurely closed the Float Accounts. But if NIFA *could not* make such deposits, then NIFA, not BayernLB, would be in breach of the Investment Agreements.

In sum, the Court cannot determine whether BayernLB breached the Investment Agreements without first determining whether NIFA breached them. Genuine issues of material fact preclude the Court from resolving this second issue. So too the first.

---

6   The parties also contest whether the first part of this termination trigger — "a withdrawal of all Invested Moneys" — occurred. (*Compare* NIFA Opp. 8-9 n.6 (as contemplated in Investment Agreements, only Trustee could "withdraw" funds from Float Accounts), *with* BayernLB Opp. 4 and n.2 ("withdrawal" occurred when BayernLB returned money held in Float Accounts to Trustee)).

**CONCLUSION**

For the reasons set forth above, BayernLB's motion for summary judgment is DENIED, and NIFA's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Pursuant to the Court's June 9, 2016 endorsement (*see* Dkt. #56), the revised deadline for expert discovery in this matter is **March 23, 2017**. The parties are ORDERED to appear before the Court for a post-discovery conference on **March 29, 2017, at 3:30 p.m.**, in Courtroom 519 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007. The Court will set a trial schedule at this conference.

SO ORDERED.

Dated:   February 27, 2017
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge